AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico   ▼

FILED
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>1325 Ortiz Dr Unit #2, Albuquerque, New Mexico 87108<br>occupied by Jerome TRUJILLO  further described in<br>ATTACHMENT A | )<br>)<br>)<br>)<br>)<br>)   Case No.  MR 22-1003 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A (incorporated by reference).

located in the _____ District of ____**New Mexico**____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | *Offense Description* |
|---|---|
| 18 USC 922(g)(1) | Felon in Possession of a Firearm |
| 21 USC 841(a)(1) | Distribution of Methamphetamine |
| 21 USC 843 | Use of a Telephone Facility to Facilitate a Drug Trafficking Crime |

The application is based on these facts:
Please see the attached Affidavit of ATF Special Agent Amber Pace, which is incorporated by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Amber Pace, ATF Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
____telephonically sworn and electronically signed____ *(specify reliable electronic means).*

Date: __June 28, 2022__

*Judge's signature*

City and state: ~~Albuquerque, New Mexico~~

Hon. B. Paul Briones, United States Magistrate Judge
*Printed name and title*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| In the Matter of the Search of:<br><br>1325 Ortiz Dr Unit #2 SE, Albuquerque, New Mexico, occupied by Jerome TRUJILLO further described in ATTACHMENT A | Case No. _____ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Amber Pace, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, being duly sworn, depose and state as follows:

## INTRODUCTION

1. I am a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been so employed since August 2020. I am a graduate of the University of Arizona, holding a Bachelor's Degree in Public Management and Policy and a Master's Degree in Business Administration. I previously worked for the Arizona Department of Corrections for a total of eleven years and also for the Immigrations and Customs Enforcement as a Deportation Officer for almost two years. I have also attended and graduated from the Federal Law Enforcement Training Center and the ATF National Academy.

2. I have training and experience investigating violations of Federal law, including investigations involving the forensic examination of electronic devices and cellular telephones.

3. I am familiar with the information contained in this Affidavit based upon the investigation that myself and other law enforcement officers have conducted, on my conversations with other law enforcement officers or industry operations investigators who have engaged in various aspects of this investigation and based upon my review of reports written by other law enforcement officers involved in this investigation. Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are relevant to the determination of probable cause to support the issuance of the requested warrant. When the statements of others are set forth in this Affidavit, they are set forth in substance and in part.

## PURPOSE OF AFFIDAVIT

4. I make this Affidavit in support of an application for a search warrant for authorization to search 1325 Ortiz Dr SE Unit #2, Albuquerque, NM 87108 (SUBJECT RESIDENCE) further described in ATTACHMENT A and ATTACHMENT B for evidence of violations of:

   a.  18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm,
   b.  21 U.S.C. 841(a)(1): Distribution of Methamphetamine,
   c.  21 U.S.C. 843: Use of a Telephone Facility to Facilitate a Drug Trafficking Crime.

5. The (SUBJECT RESIDENCE) is further described as single story 4-plex apartment complex located in Albuquerque, New Mexico. The SUBJECT RESIDENCE is a white in color with green trim. There is a black metal security door on the SUBJECT RESIDENCE. The front entrance of the SUBJECT RESIDENCE faces north and the SUBJECT RESIDENCE. The SUBJECT RESIDENCE is located southwest of the Ross Ave SE and the Ortiz SE intersection. I seek authorization to search the (SUBJECT RESIDENCE) for the items described in ATTACHMENT B which is incorporated throughout by reference.

6. Based on my training and experience, and that of other more experienced law enforcement officers, and the facts set forth in this Affidavit, there is probable cause to believe that the above-listed violations have been committed by TRUJILLO.  There is also probable cause to search the information described in ATTACHMENT A for evidence of those crimes as described in ATTACHMENT B.

## PROBABLE CAUSE

### Initial Investigation

7. In the month of May 2022, ATF began an investigation involving an armed drug trafficker, Jerome TRUJILLO, who resides at the SUBJECT RESIDENCE (1325 Ortiz Dr Unit #2 SE, Albuquerque, NM).  I, Special Agent (SA) Amber Pace, obtained information from Undercover (UC) ATF Agent Noeh Mejia detailing specific acts committed by TRUJILLO at the SUBJECT RESIDENCE.

### Controlled Purchase

8.  On June 02, 2022, SA Mejia conducted a controlled purchase of firearms from TRUJILLO at the SUBJECT RESIDENCE from Jerome TRUJILLO. Prior to the meeting with TRUJILLO, SA Mejia made contact via cell phone and arranged the purchase of the firearms and methamphetamine.

9. Once inside, TRUJILLO produced firearms from within the SUBJECT RESIDENCE to include a Marlin Firearms CO, model 49, .22 caliber rifle and a Weihrauch Hermaan, model HW357, .357 caliber revolver for sale.

10. TRUJILLO proceeded to take out another chrome revolver and stated, "I got this one too, this one is my baby. It's a 38. Don't worry I'll get plenty more for you don't worry. I got to have something, know what I mean? Sometimes shit happens and I can't go without. You know what I mean?"

11. SA Mejia asked TRUJILLO about purchasing the methamphetamine, to which TRUJILLO replied that it had not arrived prior to the SA Mejia's arrival. TRUJILLO advised SA Mejia that the methamphetamine would arrive later." TRUJILLO also mentioned "I go drop off dope at Carrizozo, La Luz, Carlsbad. I take a tour about every two weeks. I got customers in Santa Rosa, Roswell." TRUJILLO then advised SA Mejia that he had a "Marlin 22" for sale.

12. TRUJILLO received a phone call and stated, "it's in the tackle box. It's a toolbox in the back closet. If you walk straight in its right there." TRUJILLO then walked to the bedroom and after a few seconds walked out holding a long black case and stated, "I got ammunition too." At the same time, "JOSER" walked inside the apartment holding a black tackle box and placed it down on the floor. TRUJILLO then opened the black tackle box and pulled out a black bag which contained a Kimber pistol and two (2) magazines loaded with ammunition and placed them on the glass coffee table.

13. TRUJILLO agreed to accept $1,100 for the three firearms. During the transaction, TRUJILLO walked out of the bedroom holding two (2) additional firearms and stated, "I can get these all day. I just sold a shotgun the other day."

14. Your Affiant examined the firearm and ammunition purchased on June 02, 2022. The firearms were identified as a Kimber, model Stainless Target, 10mm caliber pistol bearing serial number KF72279, a Hermann Weihrauch, model HW357, .357 caliber revolver, bearing serial number 1020034 and a Marlin Firearm Co., model 49, .22 caliber rifle bearing serial number 68227960.The ammunition was identified as nine (9) Winchester-Western, 10mm rounds of ammunition and eight (8) rounds of assorted brand 10mm ammunition.

15. The pistol and rifle were test fired and functioned and fired as designed. The revolver was field tested and functioned as designed.

**Controlled Purchase**

16. On June 21, 2022, TRUJILLO arranged for the sale of narcotics and firearms to occur at 1321 Ortiz Dr Unit #1, Albuquerque, New Mexico. TRUJILLO advised SA Mejia, via phone, that TRUJILLO was going to be out of town on June 22, 2022, but would leave the methamphetamine and firearms with his neighbor and associate, Charles Lords a/k/a "Charlie".

17. On June 22, 2022, SA Mejia conducted a controlled purchase of a methamphetamine from Jerome TRUJILLO through Charles Lord at 1321 Ortiz Dr Unit #1, Albuquerque, New Mexico.

Prior to the meeting, SA Mejia placed several calls to TRUJILLO to verify the details of the transaction in which there was no response.

18. After several attempts to reach TRUJILLO, SA Mejia arrived at 1321 Ortiz Dr Unit #1, Albuquerque, New Mexico. Lord answered the door and confirmed that he was "Charlie." Lord allowed SA Mejia into the residence.

19. Once inside the residence, Lord attempted to sell SA Mejia a smaller quantity of methamphetamine. When SA Mejia advised Lord that what was being presented by Lord was not what SA Mejia and TRUJILLO discussed, Lord placed several failed calls to TRUJILLO. Lord then began searching areas throughout the residence. Lord eventually arrived from the back bedroom with additional methamphetamine. SA Mejia provided Lord with $650.00 for the quarter pound of methamphetamine.

20. The methamphetamine field tested positive for a mixture and substance of methamphetamine and had an approximate gross weight of 119.4 grams.

### Follow-up Phone Call

21. On June 22, 2022, SA Mejia placed a phone call to TRUJILLO. During the call, SA Mejia advised TRUJILLO that he had picked up the four ounces of methamphetamine from LORD, paid him $650, and also advised TRUJILLO that LORD attempted to sell SA Mejia two ounces of methamphetamine and had trouble locating the bag that contained four ounces of methamphetamine. TRUJILLO stated, "I gave him one with yours in it (referring to a bag containing methamphetamine) and told him this is for him." I gave him one with two and one with four (referring to ounces of methamphetamine) and I didn't want to tell him how much I was giving it to you for so I kind of kept him in the dark. I didn't tell him I gave you four (referring to ounces of methamphetamine). I told him I gave you three (referring to ounces of methamphetamine) for $650."

### Further Investigation

22. Your Affiant reviewed law enforcement and online court databases and determined TRUJILLO has been convicted of the following felony offenses: Possession of a controlled substance in D-424-CR-2000-00011, in the 4th Judicial District Court of the State of New Mexico, Possession of a controlled substance in D-1314-CR-2008-00012, out of the 13th Judicial District Court of the State of New Mexico, Felony Shoplifting in D-202-CR-2012-1765, in the 2nd Judicial District Court of the State of New Mexico, and Felony Shoplifting in D-504-CR-2014-00410, out of the 5th Judicial District Court of the State of New Mexico.

23. Your Affiant consulted with an ATF Special Agent that has received training in determining the interstate nexus of firearms and ammunition. Based on their training, knowledge, and

experience, agents determined that the above-described firearms and rounds of ammunition were not manufactured in the state of New Mexico and therefore traveled in interstate commerce.

## EVIDENCE COMMONLY FOUND ON CELL PHONES AND COMPUTERS

### Evidence of Criminal Activity Frequently Found on Phones

24. As described herein and in Attachment B, this application seeks permission to search for evidence and records that might be found in the SUBJECT RESIDENCE, in whatever form they are found. Some of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on computers, digital media and other storage media. For this reason, I submit that if a computer, digital medium, or storage medium is found in the SUBJECT RESIDENCE, there is probable cause to believe those records will be stored on that computer or storage medium. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

25. Necessity of seizing or copying entire computers or storage media. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

   a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

   b.     Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data in the vehicle. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.      Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

26. Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying computers and/or storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

27. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices to search and seizure pursuant to this warrant.  I seek this authority based on the following:

28. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

29.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

30. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

31.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is

particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

32.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) Suspect to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

33.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

34.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Suspect Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

35. Due to the foregoing, if law enforcement personnel encounter a device that is suspect to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the suspect premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## Evidence Sought During Search

36. Based on my training, experience and participation in this and in similar investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses. Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property. This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

37. Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

38. Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution. The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances. Drug dealers commonly store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

39. Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

40. Drug traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas. These items are stored by drug

dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars. Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

41. Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, contraband, money and other valuables. Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

42. Other evidence of transportation, ordering, possession and sale of drugs can include the following: telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

43. Drug traffickers usually sell their product for cash. Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

44. Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs. To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

45. Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

46. The use of digital media, including smartphones, tablets, cellular phones, and digital devics, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

47. Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs. They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives. Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

48. Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits. They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

49. I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

50. Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences.  This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

51. Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

52. Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized.  Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts.  These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

## **CONCLUSION**

53. Based on the foregoing, I respectfully submit that probable cause exists to search the SUBJECTS RESIDENCE described in ATTACHMENT A, for evidence, fruits, and instrumentalities of 18 U.S.C. §§ 922(g)(1) and 924, 21 U.S.C § 841(a)(1), and 21 U.S.C. § 843, as described in ATTACHMENT B.


Respectfully submitted,


Amber Pace, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives


Electronically submitted and telephonically sworn, this 28th day of June 2022


Hon. B. Paul Briones
United States Magistrate Judge

**ATTACHMENT A**
**DESCRIPTION OF PROPERTY TO BE SEARCHED**

The residence is located at 1325 Ortiz Dr SE Unit #2, Albuquerque, NM 87108 (SUBJECT RESIDENCE).  The SUBJECT RESIDENCE is a single story 4-plex apartment complex located in Albuquerque, New Mexico.  The SUBJECT RESIDENCE is a white in color with green trim. There is a black metal security door on the SUBJECT RESIDENCE. The front entrance of the SUBJECT RESIDENCE faces north. The SUBJECT RESIDENCE is located southwest of the Ross Ave SE and the Ortiz SE intersection. The search of the SUBJECT RESIDENCE shall include the entire residence and all outbuildings, trashcans, or storage containers designated for use by the SUBJECT RESIDENCE, and any vehicles parked at, or in front of, the SUBJECT RESIDENCE that have an apparent connection to the SUBJECT RESIDENCE and/or association with Jerome TRUJILLO.

## ATTACHMENT B
## ITEMS TO BE SEIZED

All evidence of violations of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 843, and 18 U.S.C. § 922(g)(1), including:

1) Firearms and evidence of firearm possession to include holsters, magazines, gun cases and firearm components. Ammunition, to include components of ammunition, such as primers, casings, and gun powder.

2) Controlled substances, including methamphetamine.

3) Drug paraphernalia and packaging materials, scales, prescription boxes, hypodermic needles, plastic baggies, tin foil, or tape.

4) Books, records, receipts, notes, ledgers and other documents relating to transporting, ordering, purchasing, manufacturing and/or distributing controlled substances.

5) Financial documents, including credit card statements, tax returns, safe deposit records, safe deposit keys, bank records, bank statements, money orders, Western Union Money Gram or other currency transfer receipts, checking account records, cashier's checks, passbooks and other items evidencing the obtainment, concealment and/or expenditure of money.

6) Proceeds of violations of 21 USC § 841(a)(1), including bulk cash currency or financial records related thereto.

7) Cellular telephones, computers, cellular telephones, and digital storage media linked to Jerome TRUJILLO and their contents, to include phone book or contacts list, call history, text messages between co-conspirators and customers to include SMS messages, multimedia messages, and messages transmitted via internet apps, for all such messages both incoming and outgoing, audio/video files, photographs, and any other material stored on the telephones that is related to the above listed offenses.

8) Documents and articles of property tending to establish the identity of persons in control of premises, vehicles, storage areas, and containers being searched, including utility company receipts, rent receipts, addressed envelopes, and keys.

9) Communications between co-conspirators involving the acquisition, transportation, distribution, sale, and storage of controlled substances and/or proceeds of the sale of controlled substances, including methamphetamine.